FILED

2012 APR 12 PM 2:50

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY

BY FAX

FAISAL M. ZUBAIRI (SBN 244233)
zubairi.faisal@dorsey.com
JILL HAMMERBECK (SBN 258138)
hammerbeck.jill@dorsey.com
DORSEY & WHITNEY LLP
600 Anton Boulevard, Suite 2000
Costa Mesa, CA 92626
Telephone: (714) 800-1400
Facsimile: (714) 800-1499

Attorney for Defendant
FIRSTSERVICE REAL ESTATE
ADVISORS, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIKE KENT, an individual, and MARK ZEHNER, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>FIRSTSERVICE COMMERCIAL REAL ESTATE SERVICES, (USA), INC.; FIRSTSERVICE REAL ESTATE ADVISER, INC.; FIRSTSERVICE, DBA COLLIERS INTERNATIONAL REMS and DOES 1 through 20, Inclusive,<br><br>Defendants. | CASE NO. SACV12 - 0561 DOC (JPRx)<br><br>[ORANGE COUNTY SUPERIOR COURT CASE NO. 30-2012-00550361]<br><br>**APPENDIX OF STATE COURT FILINGS IN SUPPORT OF REMOVAL**<br><br>**[28 U.S.C. § 1332]**<br><br>Date Action Filed: March 2, 2012<br>Trial Date: NONE SET |

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

Attached hereto as is the appendix of state court filings, filed concurrently with Defendant FIRSTSERVICE REAL ESTATE ADVISORS, INC.'s, formerly known as, FIRSTSERVICE COMMERCIAL REAL ESTATE SERVICES (USA), INC., Notice of Removal of Action to the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1332.

All exhibits attached hereto were filed in the underlying state court action entitled *Mike Kent and Mark Zehner, plaintiffs vs. FirstService Commercial Real*

COPY

*Estate Services, (USA), Inc.; FirstService Real Estate Adviser, Inc. FirstService, DBA Colliers International REMS and Does 1 through 20, Inclusive,* Case No. 30-2012-550361. The attached exhibits are true and correct copies of the following:

Exhibit 1: the Plaintiffs' Complaint;

Exhibit 2: the Summons;

Exhibit 3: Civil Case Cover Sheet, and Civil Case Cover Sheet Addendum;

Exhibit 4: Proof of Service upon FirstService Commercial Real Estate Services(USA) Inc.;

Exhibit 5: Proof of Service upon FirstService Real Estate Advisors, Inc., formerly known as FirstService Commercial Real Estate Services(USA) Inc.;

Exhibit 6: Notice of Case Assignment;

Exhibit 7: Payment Receipt

DATED: April 12, 2012

DORSEY & WHITNEY LLP

By: ______________________________
FAISAL M. ZUBAIRI
JILL HAMMERBECK
Attorney for Defendant
FIRSTSERVICE REAL ESTATE ADVISORS, INC.

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the City of Costa Mesa, County of Orange, State of California. I am over the age of 18 years and not a party to the within action. My business address is 600 Anton Boulevard, Suite 2000, Costa Mesa, CA 92626. On April 12, 2012, I served the documents named below on the parties in this action as follows:

DOCUMENT(S) SERVED: **APPENDIX OF STATE COURT FILINGS IN SUPPORT OF REMOVAL**

SERVED UPON:

Jack Smart
Barnet Resnick
Vogt Resnick Sherak, LLP
4400 MacArthur Blvd., Suite 900
Newport Beach, CA 92658-7849
*Attorneys for Plaintiffs*

☐ (BY MAIL) I caused each such envelope, with postage thereon fully prepaid, to be placed in the United States mail at Costa Mesa, California. I am readily familiar with the practice of Dorsey & Whitney LLP for collection and processing of correspondence for mailing, said practice being that in the ordinary course of business, mail is deposited in the United States Postal Service the same day as it is placed for collection.

☐ (BY PERSONAL SERVICE) I delivered to an authorized courier or driver authorized by Time Machine to receive documents to be delivered on the same date. A proof of service signed by the authorized courier will be filed with the court upon request.

☒ (BY FEDERAL EXPRESS) I am readily familiar with the practice of Dorsey & Whitney LLP for collection and processing of correspondence for overnight delivery and know that the document(s) described herein will be deposited in a box or other facility regularly maintained by Federal Express for overnight delivery.

☒ (FEDERAL) I declare that I am employed in the office of a member of the bar of this court, at whose direction this service was made.

Executed on April 12, 2012, at Costa Mesa, California.

Jennifer Burnham

# EXHIBIT 1

Jack Smart, Esq. (SBN 150750)
Barnet Resnick, Esq. (SBN 59906)
VOGT | RESNICK | SHERAK, LLP
4400 MacArthur Blvd., Suite 900
P.O. Box 7849
Newport Beach, CA 92658-7849
Tel: (949) 851-9001
Fax: (949) 833-3445
jsmart@vrslaw.net

Attorneys for Plaintiffs MIKE KENT and MARK ZEHNER.

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
MAR 02 2012
ALAN CARLSON, Clerk of the Court

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

| | |
|---|---|
| MIKE KENT, an individual, and MARK ZEHNER, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>FIRSTSERVICE COMMERCIAL REAL ESTATE SERVICES, (USA), INC,; FIRSTSERVICE REAL ESTATE ADVISER, INC.; FIRSTSERVICE, DBA COLLIERS INTERNATIONAL REMS and DOES 1 through 20, Inclusive,<br><br>Defendants. | Case 30-2012 00550361<br><br>[UNLIMITED CIVIL]<br><br>~~ASSIGNED FOR ALL PURPOSES TO: JUDGE JAMES M. BROOKS DEPARTMENT C-12~~<br><br>JUDGE GREGORY MUNOZ<br>DEPT. C13<br><br>**COMPLAINT FOR DECLARATORY RELIEF** |

COME NOW Plaintiffs MIKE KENT, an individual, and MARK ZEHNER, an individual. ("Plaintiffs"), seeking Declaratory Relief against Defendants FIRSTSERVICE COMMERCIAL REAL ESTATE SERVICES, (USA), INC.; FIRSTSERVICE REAL ESTATE ADVISER, INC.; FIRSTSERVICE, DBA COLLIERS INTERNATIONAL REMS and DOES 1 through 20, Inclusive (hereinafter collectively referred to as "Defendants"), and allege as follows:

///

///

///

## GENERAL ALLEGATIONS

### JURISDICTION

1. Plaintiff MIKE KENT is an individual who, at all times pertinent, was residing in the County of Orange in the State of California.

2. Plaintiff MARK ZEHNER is an individual who, at all times pertinent, was residing in the County of Orange in the State of California.

3. Defendant FIRSTSERVICE COMMERCIAL REAL ESTATE SERVICES, (USA), INC, is a business entity form unknown which, all times pertinent, was doing business in the County of Orange, in the State of California.

4. Defendant FIRSTSERVICE REAL ESTATE ADVISORS, INC, is a Delaware Corporation, which, at all times pertinent, was doing business in the County of Orange, in the State of California.

5. FIRSTSERVICE, DBA Colliers International REMS is a business entity form unknown, which, at all times pertinent, was doing business in the County of Orange, in the State of California.

6. Plaintiffs do not know the true names or capacities of the Defendants sued herein as DOES 1 through 20, Inclusive, and therefore sues them under fictitious names pursuant to *Cal. Code Civ. Proc.* §474. Plaintiffs are informed and believe, and thereupon allege, that each of the Defendants designated as a DOE is legally responsible in some manner for the events and happenings herein alleged. Plaintiffs will seek leave of court to amend this complaint to show the true names and capacities of Defendants designated as a DOE when the same has been ascertained.

7. At all times hereinafter alleged, Defendants DOES 1 through 20, Inclusive, were the partners, agents, servants, and/or employees of the remaining Defendants herein and, at all times hereinafter alleged, were acting within the scope and course of such partnership, agency, and/or employment.

8. The two Employment Agreements which are the subject of this lawsuit were performed by Plaintiffs in the County of Orange in the State of California.

## FACTUAL ALLEGATIONS

9. Effective August 13, 2009, Plaintiff MIKE KENT entered into a certain EMPLOYMENT AGREEMENT with Defendant FIRSTSERVICE COMMERCIAL REAL ESTATE SERVICES whereby he became an employee of said entity in the position of "President of FirstService Commercial Real Estate, USA." (hereafter "KENT EMPLOYMENT AGREEMENT," Exhibit "A")

10. Plaintiff MIKE KENT voluntarily terminated his employment as described in said KENT EMPLOYMENT AGREEMENT effective August 2, 2011, pursuant to the procedure set forth in Section 6(c) therein.

11. As part of Plaintiff MIKE KENT'S compensation (at Section 5 ( c)), he was granted "certain equity or profit sharing" rights, as enumerated in the Schedule A which was attached to and made part of the KENT EMPLOYMENT AGREEMENT. The Equity Participation Section of the KENT EMPLOYMENT AGREEMENT provides as follows:

> "2.1 The Executive [Mr. Kent] will be granted 4% ownership interest of REMS USA business (issued as equity or pseudo equity (VAR). The Executive and the Company will work together to structure the equity or pseudo equity in a tax efficient manner for the Executive and the Company."

12. Effective September 25, 2009, Plaintiff MARK ZEHNER entered into a certain EMPLOYMENT AGREEMENT with Defendant FIRSTSERVICE REAL ESTATE ADVISERS, INC whereby he became an employee of said entity in the position of Senior Managing Director SW REMS. (hereafter "ZEHNER EMPLOYMENT AGREEMENT," Exhibit "B")

13. Plaintiff MARK ZEHNER voluntarily terminated his employment as described in said ZEHNER EMPLOYMENT AGREEMENT effective August 5, 2011, pursuant to the procedure set forth in Section 6(c) therein.

14. As part of Plaintiff MARK ZEHNER'S compensation (at Section 5 ( c)), he was granted "certain equity or profit sharing" rights , as enumerated in the Schedule A which was attached to and made part of the ZEHNER EMPLOYEMENT AGREEMENT. The Equity Participation Section of ZEHNER EMPLOYMENT AGREEMENT provides as follows:

> "The Executive [Mr. Zehner] will be granted 1% ownership interest of the REMS USA business (issued as equity or pseudo equity) in a tax efficient manner for the Executive and the Company."

14. Since their respective dates of hire (approximately two and half years ago), Plaintiffs, have yet to receive any direct financial benefit from their respective ownership interests.

15. Plaintiffs have not been issued ownership certificates nor have they been kept apprized of the financial status of the business to which they each have an ownership interest, as is required under *Cal. Corp. Code* § 1501.

16. Plaintiffs have formally requested the opportunity to inspect Defendants financial statements; however, said request has been ignored.

**FIRST CAUSE OF ACTION**

(Declaratory Relief Against All Defendants)

17. Plaintiff hereby incorporates paragraphs 1 through 16 of the General Allegations, as though fully set forth herein.

18. Through and by their counsel, Plaintiffs have sought Defendants' acknowledgment of their respective ownership rights in Defendants.

19. Notwithstanding that "Equity Participation" has been granted to Plaintiffs, and each of them by virtue of their respective employment agreements (Exhibits "A" and "B") Defendants have failed to acknowledge any ownership interests by Plaintiff in Defendants.

20. Plaintiffs are informed and believe that Defendants established numerous parent, subsidiary and affiliated entities, including the named Defendants; however, only one of the Defendants is the true parent remaining Defendant, and only one is the true entity in which Plaintiffs have ownership interests.

21. As a result, a dispute has arisen between Plaintiffs, on the one hand, and Defendants, on the other hand regarding the following issues:

a. Whether Plaintiffs have an ownership interests in Defendants;

b. In which of the Defendants do Plaintiffs have an ownership interest;

c. What is Plaintiffs' respective percentage of ownership interest; and

d. Whether Plaintiffs' ownership interests are equity or "pseudo equity."

WHEREFORE, Plaintiffs pray as follows:

1. Declaration of the Court that Plaintiffs each have an ownership interest in one or more of Defendants;

2. Declaration of the Court as to which of the Defendants Plaintiffs respectively have an ownership interest;

3. Declaration of the Court as to each Plaintiff's respective percentage of ownership interest;

4. Declaration of the Court as to whether each Plaintiff's respective ownership interest is an equity interest or an pseudo equity interest;

5. Cost of suit; and

6. For other and further relief that the Courts deems just and proper.

DATED: February 29, 2012

VOGT | RESNICK | SHERAK, LLP

Jack Smart
Attorneys for PlaintiffS
MIKE KENT and MARK ZEHNER,

P:\CLIENTS\K\KENT, MIKE\PLEADINGS\COMPLAINT.WPD

# EXHIBIT

A

# EMPLOYMENT AGREEMENT

**AGREEMENT** made this 13th day of August, 2009 between FirstService Commercial Real Estate Services (USA), Inc. (the "Company"), and Mike Kent, an individual who resides at the address appearing below (the "Executive").

**WITNESSETH:**

**WHEREAS**, the Executive wishes to enter into employment with the Company; and

**WHEREAS**, the Company wishes to enter into an agreement with the Executive governing the terms and conditions of his employment, and the Executive is willing to be employed on the terms and conditions hereinafter set forth;

**NOW THEREFORE**, in consideration of the promises and the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. <u>Employment</u>. The Company shall employ the Executive, and the Executive shall enter into the full-time employ of the Company, on the terms and subject to the conditions set forth in this Agreement. The Executive shall serve in the position of President, Real Estate Management Services (REMS) – USA with duties and responsibilities customary for that position plus any additional duties and responsibilities which may be assigned to the Executive from time to time by the President, FirstService Commercial Real Estate, USA or his designee. The Executive shall devote his best efforts and all of his business time and attention to the business of the Company, and agrees to abide by all by-laws, policies, practices, procedures, or rules of the Company. The Executive shall perform his duties and responsibilities under the direction and supervision of, and shall report directly to, the President, FirstService Commercial Real Estate, USA.

2. <u>Term</u>. The Executive shall be employed on an "at will" basis in accordance with the Company's normal operating policies as from time to time in effect, with no further obligation of either party pursuant to this Agreement except as specifically set forth in this Agreement.

3. <u>Outside Employment</u>. During this Agreement, the Executive will not work for any other employer or otherwise be engaged in any business activity, including serving as the director, trustee, manager or officer of any trust, partnership, joint venture, corporation or other form of organization, without the COO's prior written approval. Such approval will not be unreasonably withheld.

4. <u>Location of Employment</u>. The employee's primary location of employment will be Los Angeles, California with the understanding that the employee will have to travel to other Company locations from time to time. The Company agrees that it will not change the primary location of employment during the term of this Agreement.

5. <u>Compensation</u>. During the term of this Agreement, the Executive shall be compensated by the Company as follows:

(a) <u>Annual Base Salary</u>. The Executive shall be paid an annual base salary for the Executive's actual period of employment at a rate of two hundred and fifty thousand dollars ($250,000) per year commencing from and after the Effective Date. The Executive's base salary shall be paid in accordance with the Company's normal payroll policies as are from

time to time in effect. On or about April of each year, commencing with April 2010, the Company shall review the compensation and benefits provided to the Executive and shall make such increases thereto, if any, as may be approved by the President, FirstService Commercial Real Estate, USA in his sole discretion. Neither the Company nor the President, FirstService Commercial Real Estate, USA, however, is obligated to make any such increases.

(b) Short Term Annual Incentive Bonus. In addition to the Executive's base salary, the Executive is eligible to receive an annual incentive bonus as enumerated in Schedule A.

(c) Equity Participation. The Executive will be granted certain equity or profit sharing as enumerated in Schedule A.

(d) Vacation and Fringe Benefits. During the Executive's actual period of employment, the Executive shall be eligible for four (4) weeks vacation per year, beginning in his first year of employment. This vacation is lost if unused, and does not accrue from year to year. In addition, the Executive shall be entitled to participate in any and all group medical, dental, vision, retirement, or disability benefit plans which are from time to time maintained by the Company for its employees, in accordance with the terms and conditions of such plans or programs as they may be amended from time to time. Nothing herein contained shall be construed as requiring the Company to establish or continue any particular benefit plan in discharge of its obligations under this Agreement. The Executive shall also be entitled to those benefits enumerated in Schedule B, or such other comparable benefits as the President, FirstService Commercial Real Estate, USA, acting reasonably, may from time to time determine.

(e) Business Expenses. The Executive shall be reimbursed, in a manner consistent with the policies of the Company, for all reasonable business expenses incurred in the performance of his duties pursuant to this Agreement, to the extent such expenses are substantiated in writing, and are consistent with the general policies of the Company relating to the reimbursement of expenses of executive-level employees of the Company. Expenses for items that are reasonably deemed to be personal by the Company shall not be reimbursed by the Company and are the sole responsibility of the Executive.

(f) Deduction and Withholding. All compensation and other benefits to or on behalf of the Executive pursuant to this Agreement shall be subject to such deductions and withholding as may be agreed to by the Executive or required by applicable law, rule or regulation.

(g) Indemnification and Directors and Officers Insurance. The Company agrees to indemnify you and hold you harmless (including the costs of reasonable attorneys' fees) from any and all claims arising from or relating to your status as an employee, officer, director or agent of the Company, its affiliates, or subsidiaries, to the fullest extent permitted by Washington law, other than claims arising from your gross negligence or criminal activity. The Company will also provide to you such Directors and Officers insurance ("D&O Insurance") consistent with the coverage provided to other Senior Executives and Directors of the Company.

6. **Termination**

(a) Termination for Cause. The Company may terminate the Executive's employment for "cause" (as defined below in this Paragraph 6(a)) immediately upon written notice to the Executive. Such notice shall specify in reasonable detail the nature of the cause. For purposes of this Agreement, "cause" shall include, without limitation: (1) material breach of this Agreement, (2) violation of any law or regulation relating to employment or the Company, including its affiliates, (3) repeated violations of any Company policy, (4) willful refusal to follow an instruction of the President, FirstService Commercial Real Estate, USA. or his designee, or other conduct constituting insubordination (5) pleading guilty or "no contest to" or being charged and convicted of a crime involving theft, fraud or embezzlement or a crime that constitutes a felony, sexual misconduct, or any other offence involving moral turpitude; or (6) fraud, dishonesty, or self-dealing relating to or arising out of his employment. In the event of the involuntary termination of his employment for cause, the Executive shall not be entitled to receive any compensation hereunder other than his base salary and employee benefits as accrued through the effective date of such termination, payment for any vacation not taken in the year of termination, and to the extent not previously paid or reimbursed, any payment or reimbursement the Executive is entitled to under Paragraph 5(e) hereof. The Executive's obligations under Paragraphs 7, 8, 9, 10 and 11 shall continue under the terms and conditions of this Agreement.

(b) Termination Other Than for Cause. The Company shall have the right to terminate the Executive's employment for any reason, upon thirty (30) days' prior written notice to the Executive, whereupon the Executive's employment pursuant to this Agreement shall terminate as of the effective date of termination. In the event of the involuntary termination of his employment other than for cause, the Executive shall be entitled to receive: (1) his base salary and employee benefits as accrued through the effective date of such termination; (2) payment for any vacation not taken in the year of termination; (3) to the extent not previously paid or reimbursed, any payment or reimbursement the Executive is entitled to under Paragraph 5(e) hereof and any unpaid entitlements owed to the Executive as of the termination date; (4) any unpaid portion of his short term annual incentive bonus based on the fiscal year completed on or prior to the date of termination, to be paid in accordance with the Company's bonus payment schedule; (5)a prorated portion of any short term annual incentive bonus the Executive would have received for the fiscal year in which the termination occurs had he been employed through the end of that fiscal year, based on the targets established by the Company, such prorated bonus being payable in accordance with the Company's bonus payment schedule; (6)an amount equal to the Executive's then current base salary for six (6) months, payable in the form of salary continuance in equal installments per the Company's then current payroll schedule and. The Company shall also provide COBRA coverage to the Executive for a period of six (6) months following the first of the month after the termination date. The Executive will be entitled to receive the aforementioned amounts in this Paragraph 6(b:4-6), if and only if the Executive signs a valid general release of all claims against the Company in a form provided by the Company. All payments shall be made at normal payroll periods, subject to standard deductions, unless otherwise mutually agreed to in writing by the Executive and the Company.

(c) Voluntary Termination. The Executive may voluntarily terminate his employment under this Agreement at any time upon thirty (30) days' prior written notice to the Company, whereupon the Company's employment of the Executive shall terminate at the end of the thirty (30) day notice period. In the event of the Executive's voluntary termination of

employment, he shall not be entitled to receive any compensation hereunder other than his base salary and employee benefits as accrued through the effective date of such termination, to the extent not previously paid or reimbursed, any payment or reimbursement the Executive is entitled to under Paragraph 5(e) hereof, and payment for any vacation not taken in the year of termination.

(d) Death and Disability. The Executive's employment pursuant to this Agreement shall terminate automatically on the date of the Executive's death. No compensation shall be payable after the Executive's death other than his base salary, deferred payments as may be owed and enumerated in Schedule A, and employee benefits as accrued through the date of his death. The Executive's estate will not be entitled to any other compensation under this Agreement.

The Executive's employment pursuant to this Agreement may be terminated at the option of the Company due to the Executive's disability. In the event that the Company exercises its option to terminate the Executive due to disability, the Company will pay the Executive his base salary and employee benefits up to the date of termination; and at the date of termination the Company will pay the Executive any deferred payments as may be owed to the Executive and enumerated in Schedule A.

For purposes of this Agreement, the Executive shall be deemed to be disabled (as medically determined by an independent physician), if for a period of at least six (6) consecutive months he is unable to perform the essential functions of his position with the Company with or without reasonable accommodation.

For purposes of this Agreement, if the Executive's employment terminates by reason of his disability, his employment termination date shall be deemed to be the date on which the Company exercises its option to terminate.

7. **Confidentiality of Information.**

(a) Scope. During the term of his employment with the Company and thereafter the Executive shall not at any time, whether during or after his employment by the Company, take or use, or otherwise disclose to anyone, any Confidential Information, except as necessary to perform his duties hereunder, as permitted by the President, FirstService Commercial Real Estate, USA, or as required by any court or governmental agency.

(b) Definition. "Confidential Information" shall mean any and all trade secrets, ideas, suggestions, innovations, conceptions, discoveries, strategies, improvements, technological developments, methods, processes, specifications, formulae, compositions, techniques, systems, computer software and programs, notes, memoranda, work sheets, lists of actual or potential customers and suppliers, pricing information and policies, works of authorship, products, data, and information in any form, which concern or relate to any aspect of the actual or contemplated business of the Company and which are stamped "confidential" or are otherwise treated as confidential by the Company, except for such items as the Executive can prove through clear and convincing evidence were in the public domain, being publicly and openly known, prior to the date of commencement of the Executive's employment by the Company or, subsequent to such date, became part of the public domain, being publicly and openly known, through lawful and proper means.

(c) Restrictions. The Executive agrees that the restrictions set forth in this Paragraph ~~are reasonable and necessary~~ to protect the Company.

8. **Covenant Not to Compete.**

(a) Scope. For a period of six (6) months from the effective date of termination of employment, the Executive shall not, directly or indirectly:

(i) ~~for or on~~ behalf of any person or business enterprise that is in any respect ~~"competitive with the~~ business of the Company", solicit any entity or person that was a customer or known prospective customer of the Company during the twelve (12) month period immediately prior to the termination of the Executive's employment with the Company, or

(ii) undertake any employment or activity, in any capacity with, for, or on behalf of any business "competitive with the business of the Company".

For purposes of this Agreement, "competitive with the business of the Company" means an entity whose business includes any business activities that have been undertaken by the Company during the twelve (12) month period immediately prior to the termination of Executive's employment with the Company in which the Executive was in any way involved.

(b) Reform. If a court of competent jurisdiction should declare any or all of this Agreement unenforceable because of any unreasonable restriction of duration and/or geographical area in Paragraph 8(a), then such court shall have the express authority to reform Paragraph 8(a) to provide for reasonable restrictions and/or to grant the Company such other relief, at law or in equity, as are reasonably necessary to protect the interests of the Company.

9. Nonsolicitation of Employees. For a period of one (1) year from the effective date of termination of employment, the Executive shall not, directly or indirectly, induce or attempt to influence any employee of the Company or any affiliate of the Company to terminate his or her employment with the Company or any affiliate of the Company or to work for the Executive or any other person or entity. The parties hereto agree and acknowledge that publicly available job postings or general advertising of employment opportunities outside of the Company would not represent solicitation of employees for the purposes of this Paragraph, except that if the Executive uses any proprietary knowledge or confidential information of the Company to influence any publicly available job postings or general advertising, such action would be deemed a breach by the Executive of this Paragraph 9.

10. **Inventions**.

(a) "Invention(s)" shall mean discoveries, designs, programs, improvements, developments, new concepts, methods, agents, materials, and ideas, whether patentable or not, and products, processes and know-how related to the use or production thereof.

(b) The Executive agrees that any Invention which Executive has made or may make during the term of this Agreement or during the six-month period following the termination thereof, shall be the sole and exclusive property of the Company, whether or not (i) patent applications or copyright registrations are filed thereon, (ii) the Invention is utilized by the Company, or (iii) the Invention is conceived or developed by the Executive individually or jointly with others. However, the Executive has no obligation to assign to the Company any Invention for which no equipment, supplies, or facilities of the Company were used and which was developed entirely on the Executive's own time, unless:

(i) the Invention relates directly to the business of the Company,

(ii) the Invention relates to actual or demonstrably anticipated research or development work of the Company, or

(iii) the Invention directly results from any work performed by the Executive for the Company.

To determine whether the Executive has an obligation to assign any Invention to the Company, the Executive shall promptly make full written disclosure to the Company of all Inventions which he makes or on which he is working during the term of this Agreement or during the six-month period thereafter.

(c) Whenever requested by the Company, the Executive agrees to assist and cooperate with the Company, at the Company's expense, in the obtaining, maintaining and enforcing of United States and foreign patents and copyright registrations for any Invention which is to be the property of the Company as provided above. This assistance and cooperation shall include, but is not limited to:

(i) making application for United States and foreign patents or copyright registrations on any Invention if so requested by the Company,

(ii) assigning all of the Executive's right, title and interest in and to such Invention and any patent applications or copyright registrations thereon to the Company or its designee; and

(iii) executing all documents and rendering all assistance as may be reasonably necessary to protect the rights of the Company or its designee and to vest in the Company or its designee all rights to any such Invention, patent application, patent, copyright, or copyright registration.

11. **Responsibilities Upon Termination**. Upon the termination of his employment by the Company for whatever reason and irrespective of whether or not such termination is voluntary on his part:

(a) the Executive shall promptly deliver to the Company all of its data, designs, drawings, plans, manuals, notes, memoranda, work sheets, specifications, customer lists, supplier lists, pricing information, computer programs, and all other materials which are or have become the property of the Company and all copies or reproductions of any such; and

(b) the Executive shall advise the Company of the identity of any new employer, if that employer is in competition with the business of the Company as that term is defined in Paragraph 8, within ten (10) days after accepting new employment.

12. Separate Agreements. The covenants of the Executive contained in Paragraphs 7, 8, 9, 10 and 11 of this Agreement shall be construed as separate agreements independent of any other agreement, claim or cause of action of the Executive against the Company, whether predicated on this Agreement or otherwise, and no other agreement, claim or cause of action asserted by the Executive shall constitute a defense in the enforcement by the Company of these covenants. The covenants contained in this Agreement are necessary to protect the legitimate business interests of the Company. Damages for the violation of any such covenants will not give full and sufficient relief to the Company. In the event of any violation of any such covenants, the Company shall be entitled (i) to injunctive relief against the continued violation thereof, and (ii) to its actual damages. In any dispute concerning whether or not the Executive has violated any of such covenants, the prevailing party shall be entitled to payment from the other party for any and all expenses, including attorneys' fees and expenses, incurred by the prevailing party in connection with such dispute.

13. General.

(a) Survival. The covenants of the Executive contained in Paragraphs 7, 8, 9, 10 and 11 of the Agreement, shall survive the term of the Executive's employment under this Agreement.

(b) Notices. All notices, demands and other communications provided for by this Agreement shall be in writing and shall be deemed to have been given at the time the same is delivered in person or is mailed by registered or certified mail addressed as follows,

| | |
|---|---|
| To the Company: | Attn: Peter Humphries<br>601 Union Street, Suite 5300<br>Seattle, WA 98101 |
| To the Executive: | Mike Kent<br>269 Prospect Avenue<br>Long Beach, CA 90803. |

Either party wishing to change the address to which notices, requests, demands and other communications under this Agreement shall be sent shall give written notice of such change to the other party.

(c) Dispute Resolution. Except for enforcement of any rights to equitable relief pursuant to Paragraphs 7 through 11 above, any controversy, claim or dispute arising out of or relating to Executive's employment with the Company either during the existence of the employment relationship or afterwards, and including, but not limited to, any common law or

statutory claims for wrongful discharge, discrimination or unpaid compensation, shall be resolved exclusively by arbitration in Seattle, Washington. Arbitration shall be conducted in accordance with the now prevailing commercial arbitration rules of the American Arbitration Association (the "AAA"), with one arbitrator designated in accordance with those rules. The parties shall, acting reasonably, attempt to mutually agree upon a single arbitrator, provided that, if they cannot so mutually agree within 10 business days following the day on which the last of the parties to a dispute receives his or her copy of the Arbitration Notice, the sole arbitrator for such Dispute shall be appointed by a judge of a court of competent jurisdiction located in the city where the arbitration is to take place. The parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection. All arbitration proceedings, as well as the fact of their occurrence, shall be kept confidential by all of the parties hereto and may only be disclosed to their personal representatives and legal and other professional advisors or as required by law and as is necessary to confirm, correct, vacate or enforce the arbitration award. In any such dispute, the prevailing party shall be entitled to its or his attorneys' fees and costs, in addition to any other relief that may be awarded.

(d) Governing Law. This Agreement shall be governed by the laws of the State of California.

(e) Waiver. The waiver or failure of either party to insist in any one or more instances upon performance of any term, covenant or condition of this Agreement shall not be construed as a waiver of future performance of any such term, covenant or condition, but the obligations of either party with respect to such term, covenant or condition shall continue in full force and effect. No course of dealing shall be implied or arise from any waiver or series of waivers of any right or remedy hereunder.

(f) Severability. Each provision of this Agreement shall be interpreted where possible in a manner necessary to sustain its legality and enforceability. If any provision of this Agreement shall be unenforceable or invalid under applicable law, such provision shall be limited to the minimum extent necessary to render the same enforceable or valid. The unenforceability of any provision of this Agreement in a specific situation, or the unenforceability of any portion of any provision of this Agreement in a specific situation, shall not affect the enforceability of (i) that provision or portion of provision in another situation or (ii) the other provisions or portions of provisions of this Agreement if such other provisions or the remaining portions could then continue to conform with the purposes of this Agreement and the terms and requirements of applicable law.

(g) Amendments. This Agreement shall not be amended orally, but only by a written instrument executed by each party to this Agreement.

(h) Counterparts. This Agreement may be executed in several counterparts, by original or facsimile signature, each of which so executed shall be deemed to be an original and such counterparts together shall be deemed to be one and the same instrument, which shall be deemed to be executed as of the first date written above.

(i) Entire Agreement. This Agreement embodies the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all

prior oral and written agreements and understandings between the Company and the Executive with respect to the subject matter hereof.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

**FIRSTSERVICE COMMERCIAL REAL ESTATE SERVICES**

By: Peter Humphries
Its: Director

**EXECUTIVE**

Mike Kent

## SCHEDULE A

This Schedule forms an integral part of an employment agreement made the 13th day of August, 2009 (the "**Employment Agreement**") between FirstService Commercial Real Estate Services (USA), Inc. (the "**Company**") and Mike Kent (the "**Executive**").

**1. Short Term Annual Incentive Bonus**

1.1 Commencing January 1, 2010, the Executive will be entitled to an annual incentive bonus target of 100% of his base salary based on meeting a combination of non financial performance goals and competencies/behaviors and financial performance goals of the REMS – USA business.

1.2 For fiscal year 2010, the Executive's annual incentive bonus is guaranteed to be no less than $200,000. *There will be no guarantees for annual incentive bonus after 2010.*

1.3 Goals will be agreed between the Executive and the President, FirstService Commercial Real Estate – USA at the beginning of each calendar year and actual performance assessed on or about December 31 of that calendar year. The goals will be measurable and time bound.

1.4 The Executives performance against goals and competencies will be measured using the Company's scorecard.

1.5 Following the calendar year earned, 20% of the Executives annual bonus under this Section will be paid in February and 80% will be paid in April - in accordance with the Company's normal payroll processes.

**2. Equity Participation**

2.1 The Executive will be granted 4% ownership interest of REMS USA (issued as equity or pseudo equity (VAR)). The Executive and the Company will work together to structure the equity or pseudo equity in a tax efficient manner for the Executive and the Company.

2.2 This Section will be contingent upon and subject to the Executive's executing the Company's standard shareholders agreement or a similar device that the Company deems appropriate. Upon successful completion of the terms in this Section, the Executive will be eligible to sell equity back to the Company following at least 5 years from the Effective Date of the Executive's Employment Agreement, at an agreed multiple of 4 times the average EBITDA earnings of the REMS – USA Business of the prior 2 years less any outstanding debt in the REMS USA business.

2.3 In addition, the Company will make available to the Executive for the sole and exclusive purpose of recruiting or retaining other senior professional to the REMS – USA Business – an amount up to a maximum of 6% equity or pseudo equity in the US REMS Business.

************************************

**SCHEDULE B**

This Schedule forms an integral part of an employment agreement made the 13th day of August 2009 (the "**Employment Agreement**") between FirstService Commercial Real Estate Services (USA), Inc. (the "**Company**") and Mike Kent (the "**Executive**").

1. **Car Allowance:** An automobile allowance in the total amount of $500 per calendar month, or such other amount as may be agreed upon, in writing, between the parties to the Employment Agreement, which allowance the Executive hereby agrees shall be used by him for paying all costs associated with: (i) his owning or leasing an automobile of his own choice for his use in connection with the performance of his duties and obligations under the Employment Agreement; and (ii) the operation, repair, licensing, maintenance and insuring of such automobile.

2. **Long Term Disability:** The Company will provide to the Executive long term disability insurance in line with the standard program in place for U.S. based Executives of the Company. Current plan provides a benefit of 60% of the first $10,000 in monthly compensation and 40% of the next $5,000 on monthly compensation, to a maximum of $12,000, a 60-day waiting qualifying period and a 2 year own occupation provision.

3. **Life Insurance:** The Corporation will provide to the Executive a Basic Life Insurance Policy with a death benefit of $200,000 (U.S.).

4. **401K:** The Executive shall be entitled to participate in the Company's 401k Plan, which is made available by the Company to its employees, subject to the provisions, rules, and regulations applicable to all Company employees.

5. **Vacation** – 20 days of paid vacation per year.

6. **Parking:** If applicable, the Company shall pay for a standard parking space in or near the building that the Company operates in Los Angeles, CA.

7. **Wireless Phone:** The Company shall reimburse to the Executive all reasonable expenses incurred in the monthly wireless phone expenses associated with the Executive's employment.

************************************

FIRST AMENDMENT

TO

EMPLOYMENT AGREEMENT

BETWEEN

FIRSTSERVICE COMMERCIAL REAL ESTATE SERVICES (USA), INC.

AND

MIKE KENT

(the "Parties")

This First Amendment to Employment Agreement ("First Amendment") entered into on December 31, 2010, by and between FirstService Commercial Real Estate Services (USA), Inc. (the "Company") and Mike Kent ("Employee") amends the Employment Agreement dated August 13, 2009 (the "Agreement") between the Parties as follows:

1. Section 1.2 of Schedule A of the Agreement, shall be replaced and amended as follows:

   1.2 For fiscal year 2010, the Executive's annual incentive bonus is guaranteed to be no less than $100,000. There will be no guarantees for annual incentive bonus after 2010.

2. Section 1.5 of Schedule A of the Agreement, shall be replaced and amended as follows:

   1.5 Following the calendar year earned, the Executive's annual bonus under this section will be paid during the last pay cycle in February in accordance with the Company's normal payroll processes.

Capitalized terms used and not defined in this First Amendment shall have the respective meaning set forth in the Agreement. The remainder of the Agreement shall remain in full force and effect without change.

This First Amendment is agreed to and accepted on this 31 day of December, 2010:

Dylan Taylor
CEO | USA

Mike Kent

EXHIBIT

B

# EMPLOYMENT AGREEMENT

**AGREEMENT** made this 25 day of September, 2009 between FirstService Real Estate Advisors, Inc. (the "Company"), and Mark Zehner an individual who resides at the 1061 El Camino Lane, Santa Ana, CA 92705 (the "Executive").

**W I T N E S S E T H:**

**WHEREAS,** the Executive wishes to enter into employment with the Company; and

**WHEREAS,** the Company wishes to enter into an agreement with the Executive governing the terms and conditions of his employment, and the Executive is willing to be employed on the terms and conditions hereinafter set forth;

**NOW THEREFORE,** in consideration of the promises and the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. **Employment.** The Company shall employ the Executive, and the Executive shall enter into the full-time employ of the Company, on the terms and subject to the conditions set forth in this Agreement. The Executive shall serve in the position of Senior Managing Director- SW, REMS, with duties and responsibilities customary for that position plus any additional duties and responsibilities which may be assigned to the Executive from time to time by the President, Real Estate Management Services (REMS), First Service Real Estate Advisors, USA or his designee. The Executive shall devote his best efforts and all of his business time and attention to the business of the Company, and agrees to abide by all by-laws, policies, practices, procedures, or rules of the Company. The Executive shall perform his duties and responsibilities under the direction and supervision of, and shall report directly to, the President, Real Estate Management Services (REMS), USA

2. **Term.** The Executive shall be employed on an "at will" basis in accordance with the Company's normal operating policies as from time to time in effect, with no further obligation of either party pursuant to this Agreement except as specifically set forth in this Agreement.

3. **Outside Employment.** During this Agreement, the Executive will not work for any other employer or otherwise be engaged in any business activity, including serving as the director, trustee, manager or officer of any trust, partnership, joint venture, corporation or other form of organization, without the President's prior written approval. Such approval will not be unreasonably withheld.

4. **Location of Employment.** The employee's primary location of employment will be Southwest Metro area. As a condition of his role, Executive will have to travel to other Company locations from time to time. The Company agrees that it will not change the primary location of employment during the term of this Agreement.

5. **Compensation.** During the term of this Agreement, the Executive shall be compensated by the Company as follows:

(a) Annual Base Salary. The Executive shall be paid an annual base salary for the Executive's actual period of employment at a rate of two hundred fifteen thousand dollars ($215,000) per year commencing from and after the Effective Date. The Executive's base salary shall be paid in accordance with the Company's normal payroll policies as are from time to time in effect. On or about April of each year, commencing with April 2010, the Company

shall review the compensation and benefits provided to the Executive and shall make such increases thereto, if any, as may be approved by the President, Real Estate Management Services (REMS), USA in his sole discretion. Neither the Company nor the President, Real Estate Management Services (REMS) USA, however, is obligated to make any such increases.

(b) Short Term Annual Incentive Bonus. In addition to the Executive's base salary, the Executive is eligible to receive an annual incentive bonus as enumerated in Schedule A.

(c) Equity Participation.. The Executive will be granted certain equity or profit sharing as enumerated in Schedule A.

(d) Vacation and Fringe Benefits. During the Executive's actual period of employment, the Executive shall be eligible for four (4) weeks vacation per year, beginning in his first year of employment. This vacation is lost if unused, and does not accrue from year to year. In addition, the Executive shall be entitled to participate in any and all group medical, dental, vision, retirement, or disability benefit plans which are from time to time maintained by the Company for its employees, in accordance with the terms and conditions of such plans or programs as they may be amended from time to time. Nothing herein contained shall be construed as requiring the Company to establish or continue any particular benefit plan in discharge of its obligations under this Agreement. The Executive shall also be entitled to those benefits enumerated in Schedule B, or such other comparable benefits as the President, Real Estate Management Services (REMS), USA, acting reasonably, may from time to time determine.

(e) Business Expenses. The Executive shall be reimbursed, in a manner consistent with the policies of the Company, for all reasonable business expenses incurred in the performance of his duties pursuant to this Agreement, to the extent such expenses are substantiated in writing, and are consistent with the general policies of the Company relating to the reimbursement of expenses of executive-level employees of the Company. Expenses for items that are reasonably deemed to be personal by the Company shall not be reimbursed by the Company and are the sole responsibility of the Executive.

(f) Deduction and Withholding. All compensation and other benefits to or on behalf of the Executive pursuant to this Agreement shall be subject to such deductions and withholding as may be agreed to by the Executive or required by applicable law, rule or regulation.

(g) Indemnification and Directors and Officers Insurance. The Company agrees to indemnify you and hold you harmless (including the costs of reasonable attorneys' fees) from any and all claims arising from or relating to your status as an employee, officer, director or agent of the Company, its affiliates, or subsidiaries, to the fullest extent permitted by applicable law, other than claims arising from your gross negligence or criminal activity. The Company will also provide to you such Directors and Officers insurance ("D&O Insurance") consistent with the coverage provided to other Senior Executives and Directors of the Company.

6. **Termination**

(a) Termination for Cause. The Company may terminate the Executive's employment for "cause" (as defined below in this Paragraph 6(a)) immediately upon written notice to the Executive. Such notice shall specify in reasonable detail the nature of the cause. For purposes of this Agreement, "cause" shall include, without limitation: (1) material breach of this Agreement, (2) violation of any law or regulation relating to employment or the Company, including its affiliates, (3) repeated violations of any Company policy, (4) willful refusal to follow an instruction of the President, Real Estate Management Services (REMS), USA, or his designee, or other conduct constituting insubordination (5) pleading guilty or "no contest to" or being charged and convicted of a crime involving theft, fraud or embezzlement or a crime that constitutes a felony, sexual misconduct, or any other offence involving moral turpitude; or (6) fraud, dishonesty, or self-dealing relating to or arising out of his employment. In the event of the involuntary termination of his employment for cause, the Executive shall not be entitled to receive any compensation hereunder other than his base salary and employee benefits as accrued through the effective date of such termination, payment for any vacation not taken in the year of termination, and to the extent not previously paid or reimbursed, any payment or reimbursement the Executive is entitled to under Paragraph 5(e) hereof. The Executive's obligations under Paragraphs 7, 8, 9, 10 and 11 shall continue under the terms and conditions of this Agreement.

(b) Termination Other Than for Cause. The Company shall have the right to terminate the Executive's employment for any reason, upon thirty (30) days' prior written notice to the Executive, whereupon the Executive's employment pursuant to this Agreement shall terminate as of the effective date of termination. In the event of the involuntary termination of his employment other than for cause, the Executive shall be entitled to receive: (1) his base salary and employee benefits as accrued through the effective date of such termination; (2) payment for any vacation not taken in the year of termination; (3) to the extent not previously paid or reimbursed, any payment or reimbursement the Executive is entitled to under Paragraph 5(e) hereof and any unpaid entitlements owed to the Executive as of the termination date; (4) any unpaid portion of his short term annual incentive bonus based on the fiscal year completed on or prior to the date of termination, to be paid in accordance with the Company's bonus payment schedule; (5)a prorated portion of any short term annual incentive bonus the Executive would have received for the fiscal year in which the termination occurs had he been employed through the end of that fiscal year, based on the targets established by the Company, such prorated bonus being payable in accordance with the Company's bonus payment schedule; (6)an amount equal to the Executive's then current base salary for six months (6), payable in the form of salary continuance in equal installments per the Company's then current payroll schedule and. The Company shall also provide COBRA coverage to the Executive for a period of six (6) months following the first of the month after the termination date. The Executive will be entitled to receive the aforementioned amounts in this Paragraph 6(b)(4-6), if and only if the Executive signs a valid general release of all claims against the Company in a form provided by the Company. All payments shall be made at normal payroll periods, subject to standard deductions, unless otherwise mutually agreed to in writing by the Executive and the Company.

(c) Voluntary Termination. The Executive may voluntarily terminate his employment under this Agreement at any time upon thirty (30) days' prior written notice to the Company, whereupon the Company's employment of the Executive shall terminate at the end of

the thirty (30) day notice period. In the event of the Executive's voluntary termination of employment, he shall not be entitled to receive any compensation hereunder other than his base salary and employee benefits as accrued through the effective date of such termination, to the extent not previously paid or reimbursed, any payment or reimbursement the Executive is entitled to under Paragraph 5(e) hereof, and payment for any vacation not taken in the year of termination.

(d) Death and Disability. The Executive's employment pursuant to this Agreement shall terminate automatically on the date of the Executive's death. No compensation shall be payable after the Executive's death other than his base salary, deferred payments as may be owed and enumerated in Schedule A, and employee benefits as accrued through the date of his death. The Executive's estate will not be entitled to any other compensation under this Agreement.

The Executive's employment pursuant to this Agreement may be terminated at the option of the Company due to the Executive's disability. In the event that the Company exercises its option to terminate the Executive due to disability, the Company will pay the Executive his base salary and employee benefits up to the date of termination; and at the date of termination the Company will pay the Executive any deferred payments as may be owed to the Executive and enumerated in Schedule A.

For purposes of this Agreement, the Executive shall be deemed to be disabled (as medically determined by an independent physician), if for a period of at least six (6) consecutive months he is unable to perform the essential functions of his position with the Company with or without reasonable accommodation.

For purposes of this Agreement, if the Executive's employment terminates by reason of his disability, his employment termination date shall be deemed to be the date on which the Company exercises its option to terminate.

7. **Confidentiality of Information.**

(a) Scope. During the term of his employment with the Company and thereafter the Executive shall not at any time, whether during or after his employment by the Company, take or use, or otherwise disclose to anyone, any Confidential Information, except as necessary to perform his duties hereunder, as permitted by the President, Real Estate Management Services (REMS), USA, or as required by any court or governmental agency.

(b) Definition. "Confidential Information" shall mean any and all trade secrets, ideas, suggestions, innovations, conceptions, discoveries, strategies, improvements, technological developments, methods, processes, specifications, formulae, compositions, techniques, systems, computer software and programs, notes, memoranda, work sheets, lists of actual or potential customers and suppliers, pricing information and policies, works of authorship, products, data, and information in any form, which concern or relate to any aspect of the actual or contemplated business of the Company and which are stamped "confidential" or are otherwise treated as confidential by the Company, except for such items as the Executive can prove through clear and convincing evidence were in the public domain, being publicly and openly known, prior to the date of commencement of the Executive's employment by the

Company or, subsequent to such date, became part of the public domain, being publicly and openly known, through lawful and proper means.

(c) Restrictions. The Executive agrees that the restrictions set forth in this Paragraph are reasonable and necessary to protect the Company.

8. **Covenant Not to Compete.**

(a) Scope. For a period of six (6) months from the effective date of termination of employment, the Executive shall not, directly or indirectly:

(i) for or on behalf of any person or business enterprise that is in any respect "competitive with the business of the Company", solicit any entity or person that was a customer or known prospective customer of the Company during the twelve (12) month period immediately prior to the termination of the Executive's employment with the Company, or

(ii) undertake any employment or activity, in any capacity with, for, or on behalf of any business "competitive with the business of the Company".

For purposes of this Agreement, "competitive with the business of the Company" means an entity whose business includes any business activities that have been undertaken by the Company during the twelve (12) month period immediately prior to the termination of Executive's employment with the Company in which the Executive was in any way involved.

(b) Reform. If a court of competent jurisdiction should declare any or all of this Agreement unenforceable because of any unreasonable restriction of duration and/or geographical area in Paragraph 8(a), then such court shall have the express authority to reform Paragraph 8(a) to provide for reasonable restrictions and/or to grant the Company such other relief, at law or in equity, as are reasonably necessary to protect the interests of the Company.

9. **Nonsolicitation of Employees**. For a period of one (1) year from the effective date of termination of employment, the Executive shall not, directly or indirectly, induce or attempt to influence any employee of the Company or any affiliate of the Company to terminate his or her employment with the Company or any affiliate of the Company or to work for the Executive or any other person or entity. The parties hereto agree and acknowledge that publicly available job postings or general advertising of employment opportunities outside of the Company would not represent solicitation of employees for the purposes of this Paragraph, except that if the Executive uses any proprietary knowledge or confidential information of the Company to influence any publicly available job postings or general advertising, such action would be deemed a breach by the Executive of this Paragraph 9.

10. **Inventions**.

(a) "Invention(s)" shall mean discoveries, designs, programs, improvements, developments, new concepts, methods, agents, materials, and ideas, whether patentable or not, and products, processes and know-how related to the use or production thereof.

(b) The Executive agrees that any Invention which Executive has made or may make during the term of this Agreement or during the six-month period following the termination thereof, shall be the sole and exclusive property of the Company, whether or not (i) patent applications or copyright registrations are filed thereon, (ii) the Invention is utilized by the Company, or (iii) the Invention is conceived or developed by the Executive individually or jointly with others. However, the Executive has no obligation to assign to the Company any Invention for which no equipment, supplies, or facilities of the Company were used and which was developed entirely on the Executive's own time, unless:

(i) the Invention relates directly to the business of the Company,

(ii) the Invention relates to actual or demonstrably anticipated research or development work of the Company, or

(iii) the Invention directly results from any work performed by the Executive for the Company.

To determine whether the Executive has an obligation to assign any Invention to the Company, the Executive shall promptly make full written disclosure to the Company of all Inventions which he makes or on which he is working during the term of this Agreement or during the six-month period thereafter.

(c) Whenever requested by the Company, the Executive agrees to assist and cooperate with the Company, at the Company's expense, in the obtaining, maintaining and enforcing of United States and foreign patents and copyright registrations for any Invention which is to be the property of the Company as provided above. This assistance and cooperation shall include, but is not limited to:

(i) making application for United States and foreign patents or copyright registrations on any Invention if so requested by the Company,

(ii) assigning all of the Executive's right, title and interest in and to such Invention and any patent applications or copyright registrations thereon to the Company or its designee; and

(iii) executing all documents and rendering all assistance as may be reasonably necessary to protect the rights of the Company or its designee and to vest in the Company or its designee all rights to any such Invention, patent application, patent, copyright, or copyright registration.

11. **Responsibilities Upon Termination**. Upon the termination of his employment by the Company for whatever reason and irrespective of whether or not such termination is voluntary on his part:

(a) the Executive shall promptly deliver to the Company all of its data, designs, drawings, plans, manuals, notes, memoranda, work sheets, specifications, customer lists, supplier lists, pricing information, computer programs, and all other materials which are or have become the property of the Company and all copies or reproductions of any such; and

(b) the Executive shall advise the Company of the identity of any new employer, if that employer is in competition with the business of the Company as that term is defined in Paragraph 8, within ten (10) days after accepting new employment.

12. **Separate Agreements**. The covenants of the Executive contained in Paragraphs 7, 8, 9, 10 and 11 of this Agreement shall be construed as separate agreements independent of any other agreement, claim or cause of action of the Executive against the Company, whether predicated on this Agreement or otherwise, and no other agreement, claim or cause of action asserted by the Executive shall constitute a defense to the enforcement by the Company of these covenants. The covenants contained in this Agreement are necessary to protect the legitimate business interests of the Company. Damages for the violation of any such covenants will not give full and sufficient relief to the Company. In the event of any violation of any such covenants, the Company shall be entitled (i) to injunctive relief against the continued violation thereof, and (ii) to its actual damages. In any dispute concerning whether or not the Executive has violated any of such covenants, the prevailing party shall be entitled to payment from the other party for any and all expenses, including attorneys' fees and expenses, incurred by the prevailing party in connection with such dispute.

13. **General.**

(a) Survival. The covenants of the Executive contained in Paragraphs 7, 8, 9, 10 and 11 of the Agreement, shall survive the term of the Executive's employment under this Agreement.

(b) Notices. All notices, demands and other communications provided for by this Agreement shall be in writing and shall be deemed to have been given at the time the same is delivered in person or is mailed by registered or certified mail addressed as follows:

To the Company: Attn: Mike Kent
865 South Figueroa Street, Suite 3500
Los Angeles, CA 90017

To the Executive: Mark Zehner
1061 El Camino Lane
Santa Ana, CA 92705

Either party wishing to change the address to which notices, requests, demands and other communications under this Agreement shall be sent, must give written notice of such change to the other party.

(c) Dispute Resolution. Except for enforcement of any rights to equitable relief pursuant to Paragraphs 7 through 11 above, any controversy, claim or dispute arising out of or relating to Executive's employment with the Company either during the existence of the employment relationship or afterwards, and including, but not limited to, any common law or statutory claims for wrongful discharge, discrimination or unpaid compensation, shall be resolved exclusively by arbitration in California. Arbitration shall be conducted in accordance with the now prevailing commercial arbitration rules of the American Arbitration Association (the "AAA"), with one arbitrator designated in accordance with those rules. The parties shall, acting reasonably, attempt to mutually agree upon a single arbitrator, provided that, if they cannot so mutually agree within 10 business days following the day on which the last of the parties to a dispute receives his or her copy of the Arbitration Notice, the sole arbitrator for such Dispute shall be appointed by a judge of a court of competent jurisdiction located in the city where the arbitration is to take place. The parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection. All arbitration proceedings, as well as the fact of their occurrence, shall be kept confidential by all of the parties hereto and may only be disclosed to their personal representatives and legal and other professional advisors or as required by law and as is necessary to confirm, correct, vacate or enforce the arbitration award. In any such dispute, the prevailing party shall be entitled to its or his attorneys' fees and costs, in addition to any other relief that may be awarded.

(d) Governing Law. This Agreement shall be governed by the laws of the State of California.

(e) Waiver. The waiver or failure of either party to insist in any one or more instances upon performance of any term, covenant or condition of this Agreement shall not be construed as a waiver of future performance of any such term, covenant or condition, but the obligations of either party with respect to such term, covenant or condition shall continue in full force and effect. No course of dealing shall be implied or arise from any waiver or series of waivers of any right or remedy hereunder.

(f) Severability. Each provision of this Agreement shall be interpreted where possible in a manner necessary to sustain its legality and enforceability. If any provision of this Agreement shall be unenforceable or invalid under applicable law, such provision shall be limited to the minimum extent necessary to render the same enforceable or valid. The unenforceability of any provision of this Agreement in a specific situation, or the unenforceability of any portion of any provision of this Agreement in a specific situation, shall not affect the enforceability of (i) that provision or portion of provision in another situation or (ii) the other provisions or portions of provisions of this Agreement if such other provisions or the remaining portions could then continue to conform with the purposes of this Agreement and the terms and requirements of applicable law.

(g) Amendments. This Agreement shall not be amended orally, but only by a written instrument executed by each party to this Agreement.

(h) Counterparts. This Agreement may be executed in several counterparts, by original or facsimile signature, each of which so executed shall be deemed to be an original

and such counterparts together shall be deemed to be one and the same instrument, which shall be deemed to be executed as of the first date written above.

(i) Entire Agreement. This Agreement embodies the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior oral and written agreements and understandings between the Company and the Executive with respect to the subject matter hereof.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**FIRSTSERVICE COMMERCIAL REAL ESTATE SERVICES (USA), INC.**

By: Mike Kent
President, REMS
FirstService Real Estate Advisors, USA

**EXECUTIVE**

Mark Zehner

## SCHEDULE A

This Schedule forms an integral part of an employment agreement made the 25th day of September, 2009 (the "**Employment Agreement**") between FirstService Real Estate Advisors (USA), Inc. (the "**Company**") and Mark Zehner (the "**Executive**").

### 1. *Short Term Incentives*

1.1 The Executive will have a guaranteed incentive payment for 2010 of $215,000. For 2011 moving forward an annual plan will be designed for executive that will be based on overall profitability of First Service REMS and executives individual regional performance.

1.2 Goals will be agreed between the Executive and the President, REMS FirstService Real Estate Advisors, USA at the beginning of each calendar year and actual performance assessed on or about December 31 of that calendar year. The goals will be measurable and time bound.

1.4 The Executives performance against goals and competencies will be measured using the Company's scorecard.

1.3 Following the calendar year earned, 20% of the Executives annual incentive bonus under this Section will be paid in February and 80% will be paid in April - in accordance with the Company's normal payroll processes.

### 2. Equity Participation

2.1 The Executive will be granted 1% ownership interest of the REMS USA business (issued as equity or pseudo equity such as a VAR)..

2.2 The Executive and the President REMS will determine the exact scope and nature of equities and services falling within the scope of the (Region) operations for the purposes of equity participation. The Company and the Executive will work together to structure the equity or pseudo equity in a tax efficient manner for the Executive and the Company.

************************************

## SCHEDULE B

This Schedule forms an integral part of an employment agreement made the _____ day of August 2009 (the "**Employment Agreement**") between FirstService Real Estate Advisors Services (USA), Inc. (the "**Company**") and Mark Zehner (the "**Executive**").

1. **Car Allowance:** An automobile allowance in the total amount of $500 per calendar month, or such other amount as may be agreed upon, in writing, between the parties to the Employment Agreement, which allowance the Executive hereby agrees shall be used by him for paying all costs associated with: (i) his owning or leasing an automobile of his own choice for his use in connection with the performance of his duties and obligations under the Employment Agreement; and (ii) the operation, repair, licensing, *maintenance and insuring of such automobile.*

2. **Long Term Disability:** The Company will provide to the Executive long term disability insurance in line with the standard program in place for U.S. based Executives of the Company. Current plan provides a benefit of 60% of the first $10,000 in monthly compensation and 40% of the next $5,000 on monthly compensation, to a maximum of $12,000, a 90-day waiting qualifying period and a 2 year own occupation provision.

3. **Life Insurance:** The Corporation will provide to the Executive a Basic Life Insurance Policy with a death benefit of $200,000 (U.S.).

4. **401K:** The Executive shall be entitled to participate in the Company's 401k Plan, which is made available by the Company to its employees, subject to the provisions, rules, and regulations applicable to all Company employees.

5. **Vacation** – *20 days of paid vacation per year.*

6. **Parking:** If applicable, the Company shall pay for a standard parking space in or near the building that the Company operates in the Executive's primary work location. Executive acknowledges and agrees that this is a taxable benefit above the IRS limit for the applicable year.

7. **Wireless Phone:** The Company shall reimburse to the Executive all reasonable expenses incurred in the monthly wireless phone expenses associated with the Executive's employment.

***********************************

and such counterparts together shall be deemed to be one and the same instrument, which shall be deemed to be executed as of the first date written above.

(i) Entire Agreement. This Agreement embodies the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior oral and written agreements and understandings between the Company and the Executive with respect to the subject matter hereof.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**FIRSTSERVICE COMMERCIAL REAL ESTATE SERVICES (USA), INC.**

By: Mike Kent
President, REMS
FirstService Real Estate Advisors, USA

**EXECUTIVE**

Mark Zehner

# EXHIBIT 2

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 02 2012

ALAN CARLSON, Clerk of the Court

**NOTICE TO DEFENDANT:** FirstService Commercial Real
***(AVISO AL DEMANDADO):*** Estate Services(USA), Inc., FirstService Real Estate Adviser, Inc.; FirstService, DBA Colliers International REMS and Does 1 through 20 inclusive

**YOU ARE BEING SUED BY PLAINTIFF:** Mike Kent, an
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):*** individual, and Mark Zehner, an individual

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

30-2012

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Orange County Superior Court
700 Civic Center Drive West
P.O. Box 22002
Santa Ana 92702

CASE NUMBER: *(Número del Caso):* 00550361

JUDGE GREGORY MUNOZ
DEPT. C13

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jack Smart, Esq. (SBN 150750) (949) 851-9001
Vogt|Resnick|Sherak LLP
4400 MacArthur Blvd.
Newport Beach, CA 92660

DATE: MAR 02 2012 ALAN CARLSON Clerk, by R Lucey, Deputy
*(Fecha)* *(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).* R. LUCEY

[SEAL] SUPERIOR COURT OF CALIFORNIA COUNTY OF ORANGE

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☐ on behalf of *(specify)*:

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:

# EXHIBIT 3

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Jack Smart, Esq. (SBN 150750)
Vogt|Resnick|Sherak LLP
4400 MacArthur Blvd.
Ninth Floor
Newport Beach, CA 92660
TELEPHONE NO.: (949) 851-9001 FAX NO.: (949) 851-9001
ATTORNEY FOR (Name): Mike Kent and Mark Zehner

FOR COURT USE ONLY

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
MAR 02 2012
ALAN CARLSON, Clerk of the Court

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: P.O. Box 22002
CITY AND ZIP CODE: Santa Ana 92702
BRANCH NAME: Central Justice Center

CASE NAME: Kent et al. v. FirstService Commercial Real Estate Services, (USA), Inc. et al.

## CIVIL CASE COVER SHEET

[X] Unlimited (Amount demanded exceeds $25,000)
[ ] Limited (Amount demanded is $25,000 or less)

**Complex Case Designation**
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 30-2012 00550361
JUDGE:
DEPT:

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[X] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify)*: One
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March 2, 2012
Jack Smart, Esq. (SBN 150750)
(TYPE OR PRINT NAME)
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)—Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach—Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case—Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief from Late Claim
  - Other Civil Petition

# EXHIBIT 4

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Jack Smart, Esq. (SBN 150750)<br>Vogt\|Resnick\|Sherak LLP<br>4400 MacArthur Blvd.<br>Ninth Floor<br>Newport Beach, CA 92660<br>TELEPHONE NO.: (949) 851-9001 FAX NO. (Optional): (949) 851-9001<br>E-MAIL ADDRESS (Optional): jsmart@vrslaw.net<br>ATTORNEY FOR (Name): Mike Kent and Mark Zehner | FILED<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE<br>CENTRAL JUSTICE CENTER<br>MAR 26 2012<br>ALAN CARLSON, Clerk of the Court |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange<br>STREET ADDRESS: 700 Civic Center Drive West<br>MAILING ADDRESS: P.O. Box 22002<br>CITY AND ZIP CODE: Santa Ana 92702<br>BRANCH NAME: Central Justice Center | |
| PLAINTIFF/PETITIONER: Mike Kent, an individual, and Mark Zehner, an individual<br>DEFENDANT/RESPONDENT: FirstService Commercial Real Estate | CASE NUMBER:<br>30-~~201~~ 2012-00550361 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [ ] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [ ] other *(specify documents)*:
3. a. Party served *(specify name of party as shown on documents served)*: First Service Commercial Real Estate Services, (USA),Inc.
   b. [ ] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
4. Address where the party was served: 601 Union St., Suite 5300, Seattle, WA 98101
5. I served the party *(check proper box)*
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: (2) at *(time)*:
   b. [ ] **by substituted service.** On *(date)*: at *(time)*: I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:
      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*: from *(city)*: or [ ] a declaration of mailing is attached.
      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

| PLAINTIFF/PETITIONER: Mike Kent, an individual, and Mark Zehner, an individual<br>DEFENDANT/RESPONDENT: FirstService Commercial Real Estate | CASE NUMBER:<br>30-201-00550361 |
|---|---|

5\. c. [X] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date)*: March 7, 2012 (2) from *(city)*: Newport Beach

(3) [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

(4) [X] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. [ ] **by other means** *(specify means of service and authorizing code section):*

[ ] Additional page describing service is attached.

6\. The "Notice to the Person Served" (on the summons) was completed as follows:

a. [ ] as an individual defendant.

b. [ ] as the person sued under the fictitious name of *(specify):*

c. [ ] as occupant.

d. [X] On behalf of *(specify)*: First Service Commercial Real Estate Services, (USA),Inc.

under the following Code of Civil Procedure section:

- [X] 416.10 (corporation)
- [ ] 416.20 (defunct corporation)
- [ ] 416.30 (joint stock company/association)
- [ ] 416.40 (association or partnership)
- [ ] 416.50 (public entity)
- [ ] 415.95 (business organization, form unknown)
- [ ] 416.60 (minor)
- [ ] 416.70 (ward or conservatee)
- [ ] 416.90 (authorized person)
- [ ] 415.46 (occupant)
- [ ] other:

7\. **Person who served papers**

a. Name: Julia Alexander

b. Address: 4400 MacArthur Blvd., 9th Floor, Newport Beach, CA 92660

c. Telephone number: (949) 851-9001

d. The fee for service was: $ 7.60

e. I am:

(1) [X] not a registered California process server.

(2) [ ] exempt from registration under Business and Professions Code section 22350(b).

(3) [ ] registered California process server:

(i) [ ] owner [ ] employee [ ] independent contractor.

(ii) Registration No.:

(iii) County:

8\. [X] **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9\. [ ] **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: March 26, 2012

Julia Alexander
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶ [signature]
(SIGNATURE)

30·2012·00550361

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

FirstService Comm. Real Estate Services, Inc.
601 Union St., Suite 5300
Seattle, WA 98101

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Sharon Schwartz ☐ Agent ☐ Addressee

B. Received by (Printed Name) Sharon Schwartz

C. Date of Delivery 3-13-12

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number (Transfer from service label) 7010 3090 0001 5156 1900

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

# EXHIBIT 5

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Jack Smart, Esq. (SBN 150750)
Vogt|Resnick|Sherak LLP
4400 MacArthur Blvd.
Ninth Floor
Newport Beach, CA 92660
TELEPHONE NO.: (949) 851-9001 FAX NO. *(Optional):* (949) 851-9001
E-MAIL ADDRESS *(Optional):* jsmart@vrslaw.net
ATTORNEY FOR *(Name):* Mike Kent and Mark Zehner

FOR COURT USE ONLY

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
MAR 26 2012
ALAN CARLSON, Clerk of the Court

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: P.O. Box 22002
CITY AND ZIP CODE: Santa Ana 92702
BRANCH NAME: Central Justice Center

PLAINTIFF/PETITIONER: Mike Kent, an individual, and Mark Zehner, an individual
DEFENDANT/RESPONDENT: FirstService Commercial Real Estate

CASE NUMBER:
30-~~201~~ 2012-00550361

## PROOF OF SERVICE OF SUMMONS

Ref. No. or File No.:

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [ ] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [ ] other *(specify documents):*
3. a. Party served *(specify name of party as shown on documents served):* FirstService Real Estate Advisor, Inc.
   b. [ ] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
4. Address where the party was served: 601 Union St., Suite 5300, Seattle, WA 98101
5. I served the party *(check proper box)*
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* (2) at *(time):*
   b. [ ] **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*
      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):* from *(city):* or [ ] a declaration of mailing is attached.
      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

| PLAINTIFF/PETITIONER: Mike Kent, an individual, and Mark Zehner, an individual<br>DEFENDANT/RESPONDENT: FirstService Commercial Real Estate | CASE NUMBER:<br>30-201-00550361 |
|---|---|

5. c. [X] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):* March 7, 2012 (2) from *(city):* Newport Beach

(3) [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

(4) [X] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. [ ] **by other means** *(specify means of service and authorizing code section):*

[ ] Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a. [ ] as an individual defendant.
   b. [ ] as the person sued under the fictitious name of *(specify):*
   c. [ ] as occupant.
   d. [X] On behalf of *(specify):* First Service Real Estate Advisor, Inc.
   under the following Code of Civil Procedure section:

| | |
|---|---|
| [X] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
| [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
| [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
| [ ] 416.40 (association or partnership) | [ ] 416.90 (authorized person) |
| [ ] 416.50 (public entity) | [ ] 415.46 (occupant) |
| | [ ] other: |

7. **Person who served papers**
   a. Name: Julia Alexander
   b. Address: 4400 MacArthur Blvd., 9th Floor, Newport Beach, CA 92660
   c. Telephone number: (949) 851-9001
   d. The fee for service was: $ 7.60
   e. I am:
      (1) [X] not a registered California process server.
      (2) [ ] exempt from registration under Business and Professions Code section 22350(b).
      (3) [ ] registered California process server:
         (i) [ ] owner [ ] employee [ ] independent contractor.
         (ii) Registration No.:
         (iii) County:

8. [X] **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9. [ ] **I am a California sheriff or marshal** and I certify that the foregoing is true and correct.

Date: March 26, 2012

Julia Alexander
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶ [signature]
(SIGNATURE)

30-2012-00550361

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

FirstService Real Estate
Advisor, Inc.
601 Union St, #5300
Seattle, WA 98101

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature] ☐ Agent ☐ Addressee

B. Received by (Printed Name) Shannon Stewart

C. Date of Delivery 3-13-12

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label) 7010 3090 0001 5156 1924

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

# EXHIBIT 6

# SUPERIOR COURT OF CALIFORNIA

**ORANGE**

**700 W. Civic Center DRIVE**

**Santa Ana , CA 92702**

**(657) 622-6878**

**www.occourts.org**

## NOTICE OF CASE ASSIGNMENT

Case Number: **30-2012-00550361-CU-CL-CJC**

Your case has been assigned for all purposes to the judicial officer indicated below. A copy of this information must be provided with the complaint or petition, and with any cross-complaint that names a new party to the underlying action.

| ASSIGNED JUDGE | COURT LOCATION | DEPARTMENT/ROOM | PHONE |
|---|---|---|---|
| Hon. Gregory Munoz | Central Justice Center | C13 | (657) 622-6878 |
| Hearing: | Date: | Time: | |
| **JUDGE** | **COURT LOCATION** | **DEPARTMENT/ROOM** | **PHONE** |
| Hon. | | | |

[ x ] ADR Information attached.

## SCHEDULING INFORMATION

**Judicial Scheduling Calendar Information**

Individual courtroom information and the items listed below may be found at: www.occourts.org.

Case Information, Court Local Rules, filing fees, forms, Civil Department Calendar Scheduling Chart, Department phone numbers, Complex Civil E-filing, and Road Map to Civil Filings and Hearings.

**Ex Parte Matters**

Rules for Ex Parte Applications can be found in the California Rules of Court, rules 3.1200 through 3.1207 at: www.courtinfo.ca.gov. Trials that are in progress have priority; therefore, you may be required to wait for your ex parte hearing.

**Noticed Motions**

* The following local Orange County Superior Court rules are listed for your convenience:
  - Rule 307 - Telephonic Appearance Litigants - Call CourtCall, LLC at (310) 914-7884 or (888) 88-COURT.
  - Rule 380 - Fax Filing, Rule 450 - Trial Pre-Conference (Unlimited Civil)
* All Complex Litigation cases are subject to mandatory Electronic Filing, unless excused by the Court.
* Request to Enter Default and Judgment are strongly encouraged to be filed as a single packet.

**Other Information**

Hearing dates and times can be found on the Civil Department Calendar Scheduling Chart.

All fees and papers must be filed in the Clerk's Office of the Court Location address listed above.

Date: 03/02/2012

Rochelle Lucey, Deputy Clerk

# EXHIBIT 7

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF ORANGE

**Superior Court of California, County of Orange**

700 W. Civic Center Drive
Santa Ana, CA 92702

## PAYMENT RECEIPT

**Receipt #:** 10920816

**Clerk ID:** rlucey **Transaction No:** 11096924 **Transaction Date:** 03/02/2012 **Transaction Time:** 03:23:28 PM

| Case Number | Fee Type | Qty | Fee Amount$ | Balance Due | Amount Paid | Remaining Balance |
|---|---|---|---|---|---|---|
| 30-2012-00550361-CU-CL-CJC | 166 - Complaint or other 1st paper | 1 | $395.00 | $395.00 | $395.00 | $0.0 |

Sales Tax: $0.00

**Total:** **$395.00** **Total Rem. Bal:** **$0.0**

Check Number(s): 12431

Check: $395.00

Total Amount Tendered: $395.00

Change Due: **$0.00**

Balance: **$0.00**

$25 will be charged for each returned check. www.occourts.org

# ORIGINAL